NO. 07-02-0153-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



OCTOBER 24, 2002



______________________________




RICKY CANTU, DBA RICKY'S TOWING, APPELLANT



V.



WILLIAM SCOTT MARTIN, APPELLEE




_________________________________



FROM THE COUNTY COURT AT LAW NO. 2 OF POTTER COUNTY;



NO. 89,223-2; HONORABLE PAMELA SIRMON, JUDGE



_______________________________



Before QUINN and REAVIS, JJ., and BOYD, SJ. (1)

 In a single issue, appellant Ricky Cantu, dba Ricky's Towing (Cantu), challenges a
judgment in favor of appellee William Scott Martin (Martin) for conversion arising from the
sale of two vehicles in which Martin claimed a security interest. In his issue, Cantu asks
us to decide if the trial court erred in concluding Martin had a mechanic's lien of such a
nature as to entitle him to notice of foreclosure of Cantu's licensed storage facility liens.

 The events giving rise to this appeal began when Martin performed mechanical work
on two trucks, a 1970 Chevrolet pickup and a 1984 GMC semi-tractor. The owner of the
trucks failed to pay for the work and Martin retained possession of them to secure his
mechanic's lien. See Tex. Const. art. 16 § 37; Tex. Prop. Code ch. 70 (Vernon 1995). 
Because he did not have a secure place to store the vehicles, on October 9, 2000, he hired
Cantu to move the trucks to Cantu's storage lot and store them. Cantu picked the vehicles
up the next day. According to Martin, in addition to storing the vehicles, Cantu was also
supposed to help him foreclose his lien on the vehicles. The transaction between Martin
and Cantu was memorialized by a receipt showing Martin as Cantu's customer. The
receipt contained a notice, signed by Martin, that the vehicles were subject to repossession
if storage charges were not paid.

 On October 24, 2000, Martin executed an "Affidavit of Right of Repossession or
Control" asserting his right of possession of the GMC truck. At trial, he averred that he did
so because he was instructed to do so by an employee of Cantu as a way to get the trucks
released to him. However, after being requested to do so, Cantu had refused. Cantu
testified that his agreement with Martin was that he would pay storage charges on the
trucks, "nobody else." Cantu also admitted that on at least one occasion, Martin had
attempted to pick the trucks up, but Cantu refused to let him have possession of them
because Martin would not pay the storage charges. Sometime around March 2001, Cantu
foreclosed on his storage lien and sold the trucks. It was undisputed that Cantu did not
notify Martin of the sales, nor did he pay Martin any of the sale proceeds.

 In December 2001, Martin brought the underlying suit alleging breach of contract
and conversion. After a bench trial, the trial court rendered the judgment giving rise to this
appeal. In the judgment, Martin was awarded $5,459.21 in actual damages, $251
prejudgment interest and $750 in attorney's fees. Responding to Cantu's request, the trial
court entered findings of fact and conclusions of law. In its findings of fact, the trial court
recited the factual resume we have given above. In addition, the trial court found that
Cantu knew Martin "wanted his money and if the [owner] did not pay, [Martin's] plan was
to obtain a mechanic's lien on the two vehicles." The court also found that Martin had not
been paid and that Cantu sold the trucks without notice to Martin. In a conclusion of law,
the trial court found that Cantu "converted property that he knew [Martin] claimed a
property right to by selling the property without notice . . . and in violation of [Martin's] filed
storage-mechanic's lien."

 In support of his proposition that the trial court erred in holding that Martin had a
valid mechanic's lien entitling him to notice of foreclosure of his storage lien, Cantu relies
heavily on Thompson v. Apollo Paint & Body Shop, 768 S.W.2d 373 (Tex.App.--Houston
[14th Dist.] 1989, writ denied). In doing so, he reasons that the Thompson court held that
in order to be entitled to a mechanic's lien, the mechanic must have actual, not
constructive, possession of the vehicles in question. He also argues that even if
constructive possession was sufficient, there was no constructive possession here
because there was no contract between Cantu and Martin that would give a basis for
Martin to claim constructive possession.

 The facts before Thompson are distinguishable from those present here. In that
case, Apollo Paint & Body Shop had repaired a Chevrolet Corvette belonging to Leonard
Boedecker, id. at 373-74. Apollo released the car when Boedecker gave it a check. 
Subsequently, Boedecker stopped payment on the check, then sold the Corvette to Jay
Thompson. Id. at 374. Without possession of the car, Apollo held a foreclosure sale, at
which time it claimed to have purchased the Corvette. Apollo then made demand on
Thompson for possession of the car, which caused Thompson to file suit asking for a
declaratory judgment. Apollo asserted that it was entitled to the Corvette, and recovered
judgment in the trial court. En route to reversing the trial court and finding title in
Thompson, the appellate court considered and discussed section 70.001 of the Property
Code. It noted that although the section provided that a mechanic is entitled to possession
of a vehicle if it was released in return for payment by a check later dishonored, that right
of possession and foreclosure of lien was not valid as against a bona fide purchaser. As
relevant here, Apollo had argued that its foreclosure was effective, even though it did not
have possession of the vehicle, because it had constructive possession of the vehicle. The
appellate court rejected that contention. Id. at 375.

 In this case, however, the evidence is sufficient to sustain the trial court's conclusion
that Martin did not release the vehicles because of a conditional payment, but gave
possession of them to Cantu as his bailee for the purpose of storing the trucks. As bailee
for Martin, Cantu was his agent for the limited purpose of storing the vehicles. Indeed, at
trial, Cantu testified unequivocally that he was hired to move and store the vehicles. The
trial court could properly have found that Martin still had "possession" of the vehicles within
the purview of section 70.001 of the Property Code.

 Moreover, even assuming arguendo that Martin did not have possession for
purposes of the Property Code, we note that in addition to the statutory lien and
enforcement methods set out in chapter 70 of the Property Code, section 37 of the Texas
Constitution grants mechanics a lien to secure payment for their work. That section is self-executing and does not require possession by the lienholder. Clifton v. Jones, 634 S.W.2d
883, 886 (Tex.App.--El Paso 1982, no writ).

 The record is also amply sufficient to support the conclusion that Cantu had actual
notice of Martin's lien. When asked why he took possession of the trucks, Cantu testified
that Martin "had done some work [and] was afraid that the people wouldn't come pay him
and they would . . . take the vehicle without paying his bill." Suffice it to say, under the
evidence, the trial court was justified in its conclusion that Cantu converted the vehicles
and was liable to Martin for doing so.

 Accordingly, Cantu's issue is overruled and the judgment of the trial court is
affirmed. 


 John T. Boyd

Do not publish. Senior Justice

1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. 
Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2002). 


able jurors could
do so and disregarding contrary evidence unless reasonable jurors could not. City of Keller
v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). Additionally, a party attacking the legal
sufficiency of the evidence supporting an adverse finding on an issue on which he did not
have the burden of proof must demonstrate that no evidence supports the finding. 
Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983). Next, in reviewing the factual
sufficiency of evidence supporting a finding on an issue on which the party attacking it does
not have the burden of proof, we must overrule the complaint unless, considering all of the
evidence, the finding is clearly wrong and manifestly unjust. Cain v. Bain, 709 S.W.2d 175,
176 (Tex. 1986). 
          Next, quantum meruit is an equitable remedy arising outside a contract. Vortt
Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990). It is based on
a promise, implied by law, to pay for the beneficial services rendered by one and knowingly
accepted by another. Campbell v. Northwestern Nat’l Life Ins. Co., 573 S.W.2d 496, 498
(Tex. 1978). The elements of the claim are: 1) the provision of valuable services or
materials, 2) to the person sought to be charged, 3) which services and materials were
accepted, used, or enjoyed by the person to be charged, 4) under such circumstances as
would reasonably notify the person to be charged that in performing the services, the
plaintiff expected to be paid. Vortt Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d at
944. According to Lucero, insufficient evidence exists to satisfy the second and fourth
elements. And, in support of that allegation, he cites the testimony by Lujan and his wife
wherein they indicated that they did not expect reimbursement for training and maintaining
the horse since they purportedly owned it. These statements, however, are not dispositive
of the matter. 
          First, a party may seek alternative relief under both contract and quantum meruit
claims. In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 740 (Tex. 2005). So, the fact
that the trial court found against Lujan with respect to ownership of the horse alone does
not mean he could not recover under a theory of quantum meruit. 
          Second, Lujan and his wife testified that 1) they told Lucero before taking the horse
that he (Lujan) was not going to ride horses for Lucero as he had in the past, 2) though
Lujan took the horse home, he did not ride it for several months, 3) Lucero was also
informed that the horse was being returned, 4) Lujan began to ride and train the horse after
Lucero told him he could keep it, and 5) Lujan understood the latter comment to mean that
Lucero gave Lujan the horse as a gift. To this, we add Lucero’s testimony that he thought
he had “loaned” the horse to Lujan to ride, agreed to compensate Lujan (but only as he
had before, through the provision of roping steers), wanted to eventually sell the horse, 
knew Lujan was riding it in and winning roping competitions, and wherein he opined that
the horse was worth $25,000 (a sum much higher than the horse’s value before Lujan
acquired it). Another witness testified that Lujan was known for having the ability to train
good roping horses, that Silver Steel was “green” (untrained) and would buck before Lujan
acquired it, and that the horse increased in value once Lujan began using it. From these
circumstances, the trial court could have reasonably concluded that the parties came to
no meeting of the minds with regard to the horse’s ownership and training. Thus, no
contract arose between Lujan and Lucero. So too could the trial court have legitimately
concluded that Lucero nonetheless understood that Lujan was riding and roping with the
horse, that Lujan was to be compensated for riding the horse (though the type of
compensation was debatable), that Lujan was in fact training Silver Steel via his riding and
roping with the horse, and that the horse was acquiring a greater market value due to
Lujan’s efforts. In other words, some evidence existed which supported the inference that
Lujan provided valuable services to Lucero which services Lucero accepted under the
belief that he (Lucero) would be obligated to pay Lujan for those services in some way. 
And, because the trial court could so infer based upon the evidence before it, we conclude
that decision to award Lujan quantum meruit was supported by legally sufficient evidence.
          It may well be that Lucero’s testimony with respect to the arrangement differed from
that of Lujan and his wife. Nevertheless, the trial court had the authority to assess the
credibility of the witnesses before it and resolve the inconsistencies. Ponce v. Sandoval, 
68 S.W.3d 799, 806 (Tex. App.–Amarillo 2001, no pet.). It was not required to simply
accept Lucero’s version of what occurred. Couple this with the evidence that Lucero knew
that Lujan was using the horse and thereby improving its skill and increasing by multiples
its value, we cannot say the trial court’s decision was clearly wrong and manifestly unjust
based upon the record before it. So, the decision also enjoyed the support of factually
sufficient evidence. 
          Accordingly, we overrule the points of error and affirm the judgment. 
 
                                                                           Brian Quinn 
                                                                          Chief Justice